**Ms. Bobbie Haston ROSEBORO,
Plaintiff,**

v.

**FAYETTEVILE CITY BOARD OF
EDUCATION et al., Defendants.**

**No. CIV–4–77–27.**

United States District Court,
E. D. Tennessee,
Winchester Division.

Dec. 29, 1978.

Avon N. Williams, Jr. and Maurice E. Franklin, Nashville, Tenn., for plaintiff.

Robert W. Stevens and Thomas O. Bagley, Fayetteville, Tenn., and H. Francis Stewart, Nashville, Tenn., for defendants.

## MEMORANDUM OPINION

NEESE, District Judge.

This is an action for declaratory and injunctive relief brought by the plaintiff Ms. Bobbie Haston Roseboro (also once known as Ms. Bobbie Clanton) against the defendant Fayetteville (Tennessee) City Board of Education, the individual members thereof, its superintendent of schools, the principal of one of its schools, and one of its teachers. She charged the defendants with multiple violations of the federal civil rights statutes, 42 U.S.C. §§ 1981, 1982, 1983, 1985, 1986, 1988, 2000d, and asked this Court to assert pendent jurisdiction over certain

state claims she advanced. Her application for the maintenance of this suit as a class action was denied. Memorandum opinion and order herein of November 3, 1977. A bench trial was conducted on June 23, 26–28, 1978, inclusive. This Court has jurisdiction of the subject matter and of the parties. 28 U.S.C. §§ 1331, 1343.

## BASIC FACTS

### I

The individual members of the aforenamed board, under color of Tennessee law, transferred Ms. Roseboro, a citizen of the United States, on May 9, 1977 [1] from the position of teacher of home economics in Fayetteville Junior High School (Junior High) to the consolidated position of homebound students' and kindergarten teacher [2] and, on the same date, transferred the defendant Ms. Eleanor Helton from the position of teacher of health and science in another school in the system to the consolidated position of teaching home economics and health at the Junior High. Ms. Roseboro suffered no monetary loss of salary as a result of these transfers. Both such transfers were made on the recommendation of the defendant superintendent of schools Mr. Don McAlister and were made concurrently with the transfers within the school system of 3 other white teachers. Ms. Roseboro is a black person, and Ms. Helton is a white person. The defendant Mr. Ellis neither made nor recommended the aforementioned transfers. The defendant Ms. Helton, beyond agreeing to the transfer of herself to the new position by the board members on the recommendation of the defendant Mr. McAlister, had no part in the transfer of Ms. Roseboro. [3]

---

1. All dates hereinafter were in 1977 unless otherwise indicated.

2. At the hearing of July 29, 1977 herein on the plaintiff's motion for a preliminary injunction, it was discovered by the defendants that Ms. Roseboro was not certified by the state of Tennessee to teach homebound students or kindergarten courses. Thereupon, she was reas-signed to teach remedial reading in a formerly all-white elementary school, which position she filled in the school year, 1977–1978.

3. Ms. Roseboro's claim against the defendant Ms. Helton was dismissed involuntarily at the conclusion of the plaintiff's evidence. Rule 41(b), Federal Rules of Civil Procedure.

Ms. Roseboro was at the time of the foregoing transfers senior to Ms. Helton in the Fayetteville City school system. Ms. Roseboro had earned a master's degree; Ms. Helton had not earned a master's degree. Ms. Roseboro had taught courses in home economics for the 6 years immediately preceding the transfers; Ms. Helton had received her training as a home economics teacher 18 years beforehand and had not taught that subject previously in such school system.

## II

Preliminarily to the preparation of a proposed budget for the Fayetteville City school system for the impending year 1977–1978, the defendant board members and superintendent were confronted with an admonition of the City of Fayetteville, Tennessee to pare prospective expenditures for its schools to the pragmatic minimum.[4] Having 9 more teachers than required of it by the state of Tennessee, the defendants involved with the problem began a program of retrenchment by reducing the number of its "excess" teachers to 6.

It was determined initially that the positions of 2 teachers who were retiring at the end of the 1976–1977 school year would not be filled, and that the position of another teacher, whose husband was being transferred from his position in the locality, would not be filled. Having arranged for the reduction in the teaching force, by not replacing the immediately foregoing teachers, the defendants involved considered the manner of making intra-system transfers of the teachers who were to return, so as to provide certified personnel to teach all courses to be offered.

A preregistration of students for the coming year revealed that it would then be necessary to assign some teachers to teaching more than 1 subject. This necessity reflected that only a "half-time" teacher of home economics would be required in the Junior High the following year, and that such part-time teacher of that course would be required to teach part-time also a course in either science or health.

When this latter necessity materialized, the defendant Mr. Ellis, the principal of the Junior High, met with Ms. Roseboro and advised her on March 17 that home economics[5] would be taught in that institution only half-time in the ensuing school year. Ms. Roseboro had expressed earlier to Mr. Ellis her hope that she would never again be called upon to teach a course in health.[6] Ms. Roseboro informed Mr. Ellis that she did not wish to teach a science course half-time, and the two discussed the possibility of other combinations of courses in which a teacher might instruct. Several times between that date and May 3, there were further discussions of varying lengths between Mr. Ellis and Ms. Roseboro concerning the possibilities involved in her reassignment for the impending school year.

When the matter of Ms. Roseboro's future placement in the system had not been resolved by May 3, Messrs. Ellis and McAlister conferred with Ms. Roseboro again. (This was within a week of the meeting of the defendant board, when Mr. McAlister would recommend the assignments of teachers in the system for the coming year.) Ms. Roseboro expressed no preference as to her next assignment, stating that she was willing to do " * * * whatever you-all want me to do. * * * " Mr. McAlister inquired if she were in a position to " * * * pull-up your roots and leave, * * * " and Mr. Ellis apprised her of a vacancy in a position of teaching food ser-

---

4. As it developed afterward, the school system received more revenue in the school year 1977–1978 than it had received in the immediately preceding school year.

5. This was a course in general home economics. Ms. Roseboro was certified to teach vocational home economics; Ms. Helton was certified to teach only general home economics.

6. Ms. Roseboro's disenchantment with this type of assignment emanated from her earlier experience, in which she had been required to teach such a course to a class in which were included a great many male children.

vice in the Lincoln County, Tennessee[7] school system.

Ms. Roseboro recognized her dire need economically to continue the pursuit of her professional career. She understood from Messrs. Ellis and McAlister that she was being called upon to make the personal decision, whether she could "live" from the salary produced by a position of teaching home economics on a half-day schedule. The school administrators sought to reassure Ms. Roseboro that she, as a tenured teacher, would be given a full-time teaching assignment in the Fayetteville city school system. Nonetheless, Ms. Roseboro was apprehensive, feeling " * * * I was being moved, because I was black. * * * "

Her fears were not allayed when Mr. McAlister mentioned her possible transfer to a position of teaching deprived children and working with the parents of such children in their homes. She understood this would entail her visiting in such homes after normal classroom hours, " * * * sometimes at night. * * * " The combination of all her fears and direful forebodings of the future caused her to become very upset and emotional on this occasion. Her condition was such that, after returning to her classroom, she accepted her administrators' earlier offer to relieve her from duty with a substitute teacher for the remainder of that school day. The administrators received no "clue" from Ms. Roseboro as to any preference she might have as to her assignment to teach the following school year.

### III

The superintendent Mr. McAlister met with his administrative staff 2 days afterward, on May 5, preparatory to making his recommendations to the defendant board of assignments of teachers on the Monday next following. It was his purpose, in so far as feasible, to " * * * eliminate positions rather than persons * * * " in recommending the transfers essential to filling properly the teaching positions remaining in

the system after the aforementioned retirements and resignation. The 5 final transfers implicated Ms. Roseboro. Mr. McAlister asserted that, in recommending all these transfers, he considered the qualifications, certifications, and experience in teaching in a classroom of the teachers and the number of students indicating a desire to receive instruction in home economics. Ms. Roseboro was certified to teach in the manner she did in the school year 1977–1978, and Ms. Helton was certified to teach in the manner she did in that same school year.

### IV

On May 20 a group of black parents and other concerned black citizens, interested in the Junior High, obtained an audience and met with the superintendent Mr. McAlister. One of the concerns expressed on behalf of this group was that Ms. Roseboro would receive less compensation for her services in the assignment to which she had been transferred. Mr. McAlister disabused the group of this erroneous understanding.

Another concern expressed thereat was that Ms. Roseboro would be receiving in the future a " * * * different-colored check * * * " in payment of her salary. It was explained by Mr. McAlister to the group assembled that federal funds were involved in Ms. Roseboro's new position, and that the different color scheme of checks was utilized solely for accounting purposes.

There was concern voiced also in this meeting that the number of black teachers at the Junior High was being decimated by Ms. Roseboro's being transferred away from, and Ms. Helton's being transferred into, that institution. As was observed graphically in his testimony by the lone black member of the defendant board, Mr. Tom A. Bailey, Sr., although this was true, " * * * we would still have the same amount of black teachers in our schools. * * * "

---

7. Fayetteville is the county-seat of Lincoln County, Tennessee.

Inquiry was made of Mr. McAlister in the confrontation as to the reason Ms. Roseboro was not reassigned to teach home economics part-time at the Junior High when she possessed superior qualifications and enjoyed greater seniority than Ms. Helton. Mr. McAlister responded to the effect that Ms. Helton was more competent to teach larger groups of older children than was Ms. Roseboro. The inquiry then proceeded to the question, why Ms. Roseboro had been retained by the school system for such a long period of time if she were in fact incompetent. Mr. McAlister responded with the surmise that Ms. Roseboro had " * * * probably been able to hang-on for 11 years because she's black. * * * "[8]

The black conferees then inquired generally concerning the steps which might be taken at that time by and for Ms. Roseboro. Mr. McAlister advised the group that the defendant board had a procedure by which Ms. Roseboro could request a formal hearing before the defendant board on the matter of her earlier transfer.[9] No hearing was requested of any defendant at any time by either Ms. Roseboro or anyone in her behalf.[10]

Even if Ms. Roseboro had requested and been denied a hearing by the defendant board, she was not denied her federal constitutional right to due process of law under the circumstances presented. Initially, " * * * there is no constitutionally protected right to government employment. * * * " *Orr v. Trinter*, C.A.6th (1971), 444 F.2d 128, 133[2], certiorari denied (1972), 409 U.S. 943, 92 S.Ct. 2847, 33 L.Ed.2d 767. Furthermore, Ms. Roseboro,

as a tenured teacher in Tennessee, had no guaranteed federal or state right to any specific assignment which she may have desired. T.C.A. § 49–1411; *Sullivan v. Brown*, C.A.6th (1976), 544 F.2d 279, 282[3]; *Coe v. Bogart*, C.A.6th (1975), 519 F.2d 10, 12–13[2]; *Mitchell v. Garrett* (Tenn., 1974), 510 S.W.2d 894, 897–898; *State ex rel. Pemberton v. Wilson* (Tenn., 1972), 481 S.W.2d 760, 769; *State v. Yoakum* (1956), 201 Tenn. 180, 297 S.W.2d 635, 640[5]. Finally, Ms. Roseboro's transfer within the Fayetteville city school system implicated no property or liberty interest which was subject to due process protection; in other words, under the circumstances delineated herein, the transfer and reassignment of Ms. Roseboro gave rise to no right to due process. *Sullivan v. Brown, supra*, 544 F.2d at 282[3].

The foregoing assertion by Mr. McAlister, as to the probable reason Ms. Roseboro had remained a teacher in the Fayetteville system for more than a decade, shocked and stunned her. She had a sense of being " * * * put-down * * *. I was as low as I could get. * * * " She had never before been placed on notice that she was deemed incompetent by any of the authorities in the school system of her employer; she had never been charged with incompetency as a teacher; consequently, she had been accorded no opportunity to defend herself, if such was the charge.

### V

The same or a similar group made its appearance at the meeting of June 13 of the defendant board. Ms. Roseboro was in

---

8. The defendants involved in the operation of this school system appeared to have made a studied attempt to interest competent black persons in applying for teaching positions in it. For example, the aforenamed black member of the defendant school board, Mr. Bailey, wrote many letters to black persons for this purpose. He found no interest manifested in his proposals, concluding that such persons had no interest in considering a smaller-city setting so near the Alabama-Tennessee state line. In this context, it is understandable that there was reluctance to lose the services of the first black teacher in the system's previously all-white schools.

9. The defendant board has adopted a policy, by which, through certain established procedures, any teacher or other person aggrieved by any action of that board would be accorded a formal hearing before the board.

10. Ms. Roseboro requested a hearing in the matter of her transfer, but it was communicated to Mr. William Locke, a fellow-teacher, who was serving as president of the Fayetteville Educational Association.

attendance but had little, if anything, to say;[11] the Reverend Simmie Sanders served as spokesman for the visitors. The board was asked to rescind its former action in transferring Ms. Roseboro. Some of the same concerns were expressed at this meeting as in the group's earlier encounter with Mr. McAlister, especially with reference to the amount and method of compensating Ms. Roseboro. The board did not act in rescission of its former action.

## VI

The Fayetteville City public school system has a history of racial discrimination. For many years prior to 1966, the predecessor-members of the defendant board and the predecessor(s) (prior to 1966) of the defendant Mr. McAlister, acting under color of Tennessee law, subjected, or caused to be subjected, citizens of the United States and other persons within its jurisdiction to the deprivation of their rights, privileges, and immunities secured by the Constitution on the basis of race. This was true as to students, teachers and supportive personnel of the system.

The Market Street School in such system was substantially black as to student body and faculty members in the school year 1965–1966, at which time Robert E. Lee School and Charley Bagley School in such system were substantially white as to student body and faculty members. In that year, such school system, prodded by the United States Department of Health, Education and Welfare (HEW) which threatened to withhold federal funds therefrom, commenced a program of racial desegregation. The basis of the program was the "freedom-of-choice" concept. In the first year thereunder, 24 black students enrolled in the two formerly all-white elementary schools.

During the next immediate year, the Market Street School, located in a predominantly black neighborhood, was closed as an elementary school and utilized for subsidiary purposes, and the Junior High was constructed in a predominantly white neighbor-

hood. The black principal at Market Street was reassigned as a teacher in, and the assistant principal of, the Junior High. Market Street students were reassigned to Robert E. Lee School and Charley Bagley School.

 The aforementioned history of racial discrimination in the defendant board's school system shifted the burden of showing nondiscrimination to the board, the party hereto having the power to produce the facts. *Rolfe v. County Board of Education of Lincoln County, Tennessee*, C.A.6th (1968), 391 F.2d 77, 80[4]. Unquestionably, " * * * the Fourteenth Amendment to the United States Constitution forbids the selection and assignment of teachers on the basis of race. * * * " *Ibid.*, 391 F.2d at 79[2]. Unless the defendants carried that burden, Ms. Roseboro is entitled to relief.

## VII

Ms. Roseboro applied in January, 1966 for a vacant position in the board's central office concerned with the supervision of food service in the Market Street School in connection with the kindergarten and other programs conducted there. She was advised that this position could not be filled until federal funding therefor was received. Those funds were received by the defendant board in due course, but Ms. Roseboro was not employed; rather, the position was filled by Mr. William T. Bright, who had been the principal for many, many years of the Market Street School.

Ms. Roseboro made complaint concerning her failure to be thus employed, as an ultimate result of which Mr. Mahlon J. Griffith was transmitted by the office of the Governor of Tennessee to Fayetteville to offer her a position with the state of Tennessee. After conferences with Mr. Ralph Askin, then the superintendent of schools there, and the (then) chairman of the defendant board, an understanding was reached that Ms. Roseboro would be employed by the defendant board.

---

11. She testified: "I said nothing."

The plaintiff was employed in the ensuing month of March as a teacher in the Charley Bagley School, a formerly all-white elementary school, in which a small number of black students had enrolled also. In that capacity, Ms. Roseboro performed principally clerical duties. She was then the first and only black teacher in the Fayetteville school system.

Ms. Roseboro expressed to school authorities an interest in being assigned to teach home economics. She received a promise of such an assignment's being given ultimately, but she was requested in the interim to interchange by transfer with Ms. Lucille Wooding, an older black teacher. As a consequence, she was transferred in the Fall of 1966 to the position of teaching the 4th grade in Robert E. Lee School. For the second year 1967–1968, she was transferred, with other white persons, to teach the same grade in the Market Street School.

The following Autumn, she was again transferred: this time to teach home economics in the Junior High. She remained on this assignment until the end of the school year 1969–1970. That Spring, a white student in her class told her " * * * you won't be teaching home economics next year. * * * "

Not having the benefit of this information from an official source beforehand, Ms. Roseboro was humiliated when this rumor was communicated to her by a student. She received no official information in this connection until after she read in a local newspaper that Ms. Kathleen McCowan was to teach home economics at the Junior High the next year. Ms. McCowan is a white person. Reading this newspaper article upset the plaintiff; she became depressed, frustrated and deeply concerned concerning her opportunity to continue to earn a livelihood.

At the beginning of the 1970–1971 school year, Ms. Roseboro returned to the Junior High without any assignment, except the direction of the principal of the school that she assist other teachers. In the first semester that year, she performed the duties of a teacher's aide, passed out instructional material to other teachers, and repaired library books. The plaintiff in this period felt " * * * depressed, degraded and demoted. * * * " Thereafter, she taught remedial mathematics until December, 1970 when, because Ms. McCowan was placed on maternity leave, she was reassigned to teach home economics in the Junior High until the end of the 1976–1977 school year.

As stated, desegregation was in progress in the Fayetteville school system from the time of the plaintiff's initial employment by the defendant board for the school year 1966–1967. However, throughout such employment, Ms. Roseboro, as a black teacher in that system, had special concerns: no black person had been promoted in the process to principal of any school therein, and Ms. Roseboro concluded that her chances of such a promotion were nil.

Pursuant to her transfer of May 9, Ms. Roseboro proceeded to teach remedial reading at Charley Bagley School for the entire year 1977–1978. She deemed this assignment a demotion as a teacher. She shared duties with Ms. Barbara Vannata, a white teacher, considering herself (the plaintiff) a mere aide; she had the feeling that she was performing only those functions which the white teacher, for reasons of time, and the black teacher's aides could not do. She became very unhappy, upset, depressed, frustrated and unrespected in her professional career.

## VIII

The plaintiff Ms. Roseboro felt that she was discriminated against in the matters of her attaining status as a tenured teacher and of the evaluations made of her performance by her supervisors. These evaluations were designed, not so much to "rate" the competence of teachers in the system, as they were to encourage them to improve in their chosen profession.

Some of the evaluations of Ms. Roseboro were made by the defendant Mr. McAlister when he was serving as the principal of the school wherein she taught. It was his opinion that she experienced difficulty in en-

forcing discipline in her classes and organizing and managing them, although he found satisfactory her presentation of the subject matter of the course she was teaching. When Ms. Roseboro was eligible for election for a fourth year as a teacher in the system, Mr. McAlister expressed his opinion that Ms. Roseboro's disciplinary and self-reliance problems and her lack of self-confidence rendered her performance unsatisfactory. It was his consequent recommendation to the (then) superintendent that Ms. Roseboro not be elected and attain tenure. Nonetheless, Ms. Roseboro was reengaged [12] and acquired tenure status. Mr. McAlister continued to feel, after assuming the position of superintendent of schools, that Ms. Roseboro would serve better working with smaller groups and younger children.

In her testimony, Ms. Roseboro stated that she was not aware until 1977 after this action was commenced that she had received unfavorable evaluations. She said that Mr. Tom Young, the principal of Bagley school, showed her prior evaluations. She said that she had been told that the evaluation of her personal quality relating to emotional maturity was entered on the pertinent form as "2", because she " * * * had filed this lawsuit. * * * " She described a "2" as " * * * below average; not acceptable. * * * " When Ms. Roseboro complained to her evaluator that this litigation had no relation to the emotional maturity she evinced in her classroom work, the "2" was elevated to a "3" on the theory that, while inapplicable to classroom work, her lawsuit was prejudicial to good order in the schools of her employer. Ms. Roseboro contended in addition that her disciplinary problems at times were due to her having the responsibility for " * * * overloaded * * * " classes of both 6th- and 9th-grade students.

## COMMENTARY AND DECISION

There is a great deal more implicated in this litigation than the civil rights of Ms.

Roseboro. For such reason, the Court has detailed its factual findings comprehensively. The Fayetteville school system appears to the Court to be integrated as to students, faculty and supportive personnel, but the members of its white community do not appear to have welcomed black persons into formerly all-white educational institutions with marked enthusiasm. Instead of a relaxing of racial tensions in the community accompanying this development, those tensions appear to the Court to remain.

The members of the black community appear to be apprehensive lest the number of black teachers in the schools will be decimated unless their vigilance is constant. The members of the white community appear to proceed in an attitude of doing no more than the situation requires at a minimum to break-down the racial barriers. All this is compounded by the fact that the defendant Mr. McAlister has never thought, and does not now think, that Ms. Roseboro is a sufficiently competent teacher, especially in dealing with larger groups of older students.

These underlying feelings and attitudes do not bode well for the cause of education in Fayetteville. The general effort should be to provide the best possible education for all students in the community. Teachers ought to be hired, fired, transferred, reassigned, etc., not because they happen to be white or black persons, but only because this is what appears likely to the school authorities to produce the greater good for the education of all children of the community.

Although it is not entirely free of doubt, this Court holds the opinion that Ms. Roseboro was not reassigned from her former position of teaching home economics full-time in the Junior High out of racial considerations, and that Ms. Helton was not reassigned from her former position to teaching home economics part-time in the

12. Mr. William C. Askew, then chairman of the defendant school board, testified that Ms. Roseboro was reelected, despite the adverse recommendation of her principal Mr. McAlister, be-

cause the failure to reelect her " * * * might appear to the public to be racially motivated. * * * "

Junior High from racial considerations: even 'though Ms. Roseboro is a black person and Ms. Helton is a white person and Ms. Roseboro enjoys the greater seniority and a higher education. This result was merely one of the multitude of personnel decisions that are made every day by public agencies.

" * * * The federal courts have power to intervene in affairs of public schools only to vindicate provisions of the United States Constitution or federal law. * * * " *National City Bank v. Battisti*, C.A.6th (1977), 581 F.2d 565, 569[6]. In the absence of a conclusion by this Court that the defendants were motivated by a desire to penalize Ms. Roseboro's constitutionally-protected rights, it must be presumed that the official action of the defendants involved in the transfers was regular and, if an erroneous decision was made, it " * * * can best be corrected in other ways. * * * " *Bishop v. Wood* (1976), 426 U.S. 341, 350, 96 S.Ct. 2074, 48 L.Ed.2d 684.

Since the civil rights claim of the plaintiff has been found to be without substance, her prayer for the exercise by this Court of pendent jurisdiction is declined. See *Burnett v. McNabb*, C.A.6th (1977), 565 F.2d 398, 400[2]. It is the decision of this Court that the plaintiff Ms. Bobbie Haston Roseboro hereby is DENIED all relief. Rule 58(1), Federal Rules of Civil Procedure.